## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD GREENBERG, GREGORY S. DIGSBY, LINDSEY CLARK and CHRYSTAL LEWIS, individually and on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) **CLASS ACTION COMPLAINT** ) |
| v. | ) ) **CASE NO:** |
| THE BOARD OF DIRECTORS OF THE PENTEGRA DEFINED CONTRIBUTION PLAN FOR FINANCIAL INSTITUTIONS, PENTEGRA SERVICES, INC., and JOHN DOES 1-20. | ) ) ) ) ) ) ) |
| Defendants. | ) |

Plaintiffs Richard Greenberg, Gregory S. Digsby, Lindsey Clark and Chrystal Lewis ("Plaintiffs"), by and through their attorneys, on behalf of the Pentegra Defined Contribution Plan for Financial Institutions (the "Plan")[1] themselves and all others similarly situated, state and allege as follows:

## I.        INTRODUCTION

1.        This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include the Board  of Directors of the Pentegra Defined Contribution

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Plan for Financial Institutions and its members during the Class Period[2] ("Board") and Pentegra

Services, Inc. ("Pentegra") for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary

duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1).

These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F. 2d

263, 272 n.8 (2d Cir. 1982); *see also Severstal Wheeling v. WPN Corporation*, 659 Fed.Appx. 24

(2d Cir. 2016).

3.      The Department of Labor has explicitly stated that employers are held to a "high

standard of care and diligence" and must, among other duties, both "establish a prudent process

for selecting investment options and service providers" and "monitor investment options and

service providers once selected to see that they continue to be appropriate choices."  *See, "A Look*

*at 401(k) Plan Fees,*" *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015)

(*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration

to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and

implementing strategies for the investment and management of trust assets, trustees are obligated

to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to

prudence in the investment function,' and should be applied 'not only in making investments but

---

[2] Class Period is defined below as October 13, 2014 through the date of judgment.

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

6.      The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.  *See* Investment Company Institute (also referred to as "ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2017* (June 2018), at 4.  "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*., at 5.

7.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

8.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their defined contribution plan, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

9.     At all times during the Class Period (October 13, 2014 through the date of judgment) the Plan had at least $1.8 billion dollars in assets under management.  At the end of 2017 and 2018, the Plan had over $2.2 billion dollars and $2 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.  The Plan's total assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

10.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; (2) maintaining certain funds in the Plan despite the availability of identical investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs .

11.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to the actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

12.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

14.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

15.     Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

**Plaintiffs**

16.     Plaintiff Richard Greenberg ("Greenberg") resides in Whippany, New Jersey. During his employment, Plaintiff Greenberg participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

17.     Plaintiff Gregory S. Digsby ("Digsby") resides in Marietta, Georgia.  During his employment, Plaintiff Digsby participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

18.      Plaintiff Lindsey Clark ("Clark") resides in Des Moines, Iowa.  During her employment, Plaintiff Clark participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

19.     Plaintiff Chrystal Lewis ("Lewis") resides in Charlotte, North Carolina.  During her employment, Plaintiff Lewis participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

21.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of the Plan's investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

22.     Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes

(and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer."). For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

## Defendants

### Board Defendants

23.     The Board of Directors of the Pentegra Defined Contribution Plan for Financial Institutions and its members during the Class Period (the "Board") is the Plan Sponsor and a named fiduciary. The December 31, 2018 Form 5500 of the Pentegra Defined Contribution Plan for Financial Institutions filed with the United States Department of Labor ("2018 Form 5500") at 1. The Board's primary business address is 701 Westchester Avenue, Suite 320E, White Plains, NY 10604.

24.     The Board is responsible for "[t]he general administration of the Plan and the general responsibility for carrying out the provisions of the Plan … ." The Pentegra Defined Contribution Plan for Financial Institutions, 18th Revision, as Amended and Restated on January 1, 2018 ("Plan Doc.") at 76.

25.     Pursuant to the Investment Policy Statement, the Board is responsible for selecting and purportedly monitoring the performance of and fees charged by the funds in the Plan. *See,* the Investment Policy Statement for the Pentegra Defined Contribution Plan for Financial Institutions effective as of December 31, 2019 ("IPS") at 1. As detailed in the IPS: "The Board has ultimate

authority over the asset categories and the funds represented in the Plan." *Id.*  However, as will be described in more detail below, the Board fell well short of its fiduciary responsibilities.

26.     The IPS further describes the Board as being, in theory, responsible "for the regular and ongoing monitoring of the asset classes and funds available for investment under the Plan." *Id.*  The Board is also purportedly responsible for reviewing "at least once a year, its fund selection, monitoring, and replacement processes and the performance of each of the Plan's investment options over various time periods." *Id.*  Again, the Board failed to carry out these responsibilities prudently.

27.     The Board is also supposedly responsible for ensuring that the Plan pays no more in expenses than is reasonable.  IPS at 3.  As will be detailed below, the Board failed to control the Plan's expenses.

28.     In addition, the Board has the absolute authority to delegate any of their enumerated responsibilities to another fiduciary.  As detailed in the Plan Doc.: "[t]he Board may delegate to any committee, officer, employee or agent the authority to perform any act pertaining to the Plan or the administration thereof." Plan Doc. at 76.  Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees. As detailed below, the Board appointed Pentegra to assist with its fiduciary duties.

29.     Each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority over management or disposition of the Plan's assets and because each had the ability to delegate their authority and the responsibility to monitor their appointees.

30.     The Board and its members during the Class Period are collectively referred to herein as the "Board Defendants."

**Pentegra Defendant**

31.     Pentegra Services, Inc., ("Pentegra") is a fiduciary to the Plan because it exercised discretionary control over Plan assets during the Class Period. The IPS states that Pentegra will "assist the Board with the investment monitoring, selection, and replacement process and will also report to the Board on a regular basis so the Board can make informed decisions." IPS at 1. As will be discussed in further detail below, Pentegra failed to carry out these fiduciary duties with prudence.

32.     Pentegra also acted through its officers, including the Board, and their members, to perform Plan-related fiduciary functions in the course and scope of their employment.

33.     In addition, the Board provided Pentegra with a broad grant of authority.  The Plan Doc. provides: "[t]he Board may delegate to any committee, officer, employee or agent the authority to perform any act pertaining to the Plan or the administration thereof." Plan Doc. at 76. As discussed above, the Board did delegate its authority under this provision to Pentegra. This broad grant of authority includes the ability to appoint other fiduciaries to assist Pentegra with carrying out its fiduciary duties.  *Id.*  Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

34.     For the foregoing reasons, Pentegra is and was a fiduciary of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because it exercised discretionary authority over management or disposition of the Plan's assets and because it had the ability to delegate their authority and the responsibility to monitor their appointees.

9

**Additional John Doe Defendants**

35.     To the extent that there are additional officers and employees of Pentegra and/or Board who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 11-20 include, but are not limited to, Board and/or Pentegra officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## IV.     CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between October 13, 2014 through the date of judgment (the "Class Period").

37.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 lists 27,227 Plan "participants with account balances as of the end of the plan year."  2018 Form 5500 at 2.

38.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Class members and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

39.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are/were fiduciaries of the Plan;
>
> B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;
>
> C.     Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;
>
> D.     The proper form of equitable and injunctive relief; and
>
> E.     The proper measure of monetary relief.

40.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

41.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for

Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

42.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

43.     The Plan is a multiple employer plan or MEP. The December 31, 2018 Report of Independent Auditor of the Pentegra Defined Contribution Plan for Financial Institutions ("2018 Auditor Report") at 5.  Multiple-employer plans are typically used by outsourced human resource providers known as professional employer organizations or PEOs such as Pentegra. Pentegra offers the Plan to its clients and the employees of its clients as a means of attracting and retaining business.

44.     According to the American Institute of CPAs or AICPA, PEO's "provide a means by which an employer can outsource employee management tasks, such as payroll, employee benefits, workers' compensation, recruiting, risk/safety management, and training and development." AICPA Topix Primer Series, *Multiple Employer Retirement Plans and Multiple Employer Welfare Arrangements*, AICPA 2017[5] ("AICPA") at 1.  Where a MEP is offered by a PEO the "MEP is sponsored by the PEO and adopted by the PEO's clients." *Id.*  At its most basic

---

[5] Available at https://www.aicpa.org last accessed on September 27, 2020.

level, a MEP is "a retirement plan that is adopted by two or more employers that are unrelated for income tax purposes." *Id.*

45.     As described in the 2018 Auditor Report: "[t]he Plan is a multiple-employer, tax-exempt trusteed savings plan." 2018 Auditor Report at 5. *Id.* Participating client employers ("Client Employers") make matching contributions to the Plan on behalf of their employees as opposed to Pentegra. *Id.*

46.     The Board established the Plan "to provide Members of participating Employers with a convenient way to save on a regular and long term basis … ." Plan Doc. at iii.

47.     The Plan is a "defined contribution" or "individual account" plans within the meaning of ERISA Section  3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Plan Doc. at 54.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

### *Eligibility*

48.     The factors that determine eligibility to participate in the Plan vary depending on the options chosen by each Client Employer. Plan Doc. at 9.

### *Contributions and Vesting*

49.     There are several types of contributions that can be added to a participant's account, including, but not limited to, an employee salary deferral contribution, an employer matching contribution made by a Client Employer and employer nonelective contributions. 2018 Auditor

Report at 5.  Participants can also roll over amounts from other qualified benefit or defined contribution plans.  *Id.*

50.    With regard to contributions made by participants: "[a] Member of an Employer may elect to make contributions under the Plan (in 1% increments) up to a maximum percentage specified by the Employer not to exceed 100% of his Salary." Plan Doc. at 13. The amount of contribution made by a Client Employer is left to the discretion of each Client Employer of Pentegra. As detailed in Plan Doc.: "an Employer shall contribute to the Plan on behalf of each of its Members … an amount equal to a percentage (as specified by the Employer) of the Member's contributions … ." *Id.*

51.    Vesting is left to the discretion of each Client Employer. Plan Doc. at 50.

**The Plan's Investments**

52.    Several investments were available to participants of the Plan for investment each year during the putative Class Period. The Board and Pentegra determine the appropriateness of the Plan's investment offerings and monitor investment performance. For 2018, the Plan offered a total of 38 investment options which includes 30 collective trusts, 7 mutual funds and 1 stable value fund.

53.    The assets under management in the Plan for all funds as of the end of 2018 was $2,098,207,000. 2018 Auditor Report at 3.  From 2014 to 2017 the Plan's assets under management ranged from more than $1.8 billion dollars to more than $2.2 billion dollars.

**Payment of Plan Expenses**

54.     Expenses are paid directly from the assets of the Plan.  As detailed in the 2018 Auditor Report, "[t]otal administrative expenses include administrative fees, professional fees,

transactional fees and board of director expenses that are paid by the Plan or charged against the Plan's assets." 2018 Auditor Report at 9.

## VI.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.   Defendants Lacked a Prudent Process to Select and Monitor Plan Investments.

55.   As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

56.   ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

57.   Here, the Plan's fiduciaries administered the Plan in an imprudent manner as demonstrated by numerous factors described below.  Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

#### (1)   There Was Little to No Change in Plan Investment Options for the Entirety of the Class Period.

58.   One indication of Defendants' failure to prudently monitor the Plan's funds is that the majority of the funds have been relatively the same since 2013.

59.   Failure to remove or change funds is a clear indication that Defendants were not monitoring the prudence of the Plan's funds as they should have been.

15

### (2)  The Plan's Total Plan Costs Were the Highest in Its Peer Group.

60.     Another indication that the Plan was poorly run is its dismal ranking among peers when comparing total plan costs.  According to BrightScope, a leading plan retirement industry analyst, the Plan is rated in the "highest cost" category for retirement plans above $500 million in assets under management.[6]

61.     "Many types of services are required to operate a 401(k) plan, including administrative services (e.g., recordkeeping and transaction processing), participant-focused services (e.g., participant communication, education, or advice), regulatory and compliance services (e.g., plan document services; consulting, accounting, and audit services; and legal advice), and investment management."[7]

62.     "In order to better understand the impact of fees," BrightScope, "developed a total plan cost measure that includes all fees on the audited Form 5500 reports as well as fees paid through investment expense ratios."  ICI Study at 55.

63.     Costs are of course important because "[t]he lower your costs, the greater your share of an investment's return."  Vanguard's Principles for Investing Success, at 17.[8]

64.     Pentegra's total plan costs are not only high compared to plans with over $500 million in assets, but its ranking is worse than other plans in Pentegra's peer group.  For example, according to BrightScope, with regard to total plan costs, Zurich American Insurance Company is

---

[6] *See* https://www.brightscope.com/401k-rating/55586/Board-Of-Directors-Of-Pentegra-Defined-Contribution-Plan/56539/Pentegra-Defined-Contribution-Plan-For-Financial-Institutions/ (last visited October 11, 2020).

[7] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2017* at 55 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

[8] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success/

in the category of "low fees," and both Teachers Insurance and Annuity Association of America, and Manufacturers and Traders Trust Co., are in the category of "average fees."

(2)    **The Expense Ratios of Plan Investments Were More Expensive than that of Comparable Investments**

65.    Another indication of the Plan's poor management was the fiduciaries' selection of expensive funds for the Plan.  This is apparent when viewed through the lens of several benchmarks.

66.    As a starting point, investment options have a fee for investment management and other services.  With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

67.    Vanguard's white paper on investment management fees, "Vanguard's Principles for Investing Success," talks about the importance of minimizing costs.  Importantly, "[m]arkets are unpredictable.  Costs are forever."  *Id.* at 17.  Vanguard lays out four bullet points all investors must keep in mind: higher costs can significantly depress a portfolio's growth over long periods; costs create an inevitable gap between what the markets return and what investors actually earn – but keeping expenses down can help narrow that gap; lower-cost mutual funds have tended to perform better than higher-cost funds over time; and indexed investments can be a useful tool for cost control. *Id.*

17

68.     Taking one year of the Class Period as an example, in 2018, the expense ratios for several funds in the Plan were more expensive than comparable funds found in similarly sized plans (plans having over 1 billion dollars in assets).

69.     In some cases, expense ratios were *236%* above the ICI Median (in the case of Principal Mid Cap Blend Separate Acct) and *133%* above the ICI Median (in the case of T.Rowe Price Blue Chip Growth) in the same category.  The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans. These excessively high expense ratios are detailed in the chart below:

| Current Fund | ER | Category | ICI Median | ICI Avg |
|---|---|---|---|---|
| T.Rowe Price Blue Chip Growth | 0.70% | Domestic Equity | 0.30% | 0.35% |
| Principal Mid Cap Blend Separate Acct | 1.01% | Domestic Equity | 0.30% | 0.35% |
| American Beacon Large Cap Value Inst | 0.62% | Domestic Equity | 0.30% | 0.35% |
| MFS Mass Investors Trust R6 | 0.38% | Domestic Equity | 0.30% | 0.35% |
| DFA US Small Cap I | 0.37% | Domestic Equity | 0.30% | 0.35% |
| Dodge & Cox Income Funds | 0.43% | Domestic Bond | 0.39% | 0.30% |

70.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median and average fees are based on a study conducted in 2017 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for domestic equity funds for plans over $1 billion dollars in assets was 0.52% using 2015 data compared with 0.30% in 2017.  Accordingly, the median and average expense ratios in 2020 would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart for the Plan's funds and the median and average expense ratios in the same category.

**(3) Failure to Utilize Lower Fee Share Classes**

71.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally 1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

72.     Jumbo defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for jumbo plans like the Plan.  *See, e.g., Davis et al. v. Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

73.     Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

74.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share

classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

75.     Here, had the Plan's fiduciaries prudently been carrying out "the regular and ongoing monitoring of the asset classes and funds available for investment under the Plan." as their own Investment Policy states, they would have selected the lower-priced identical funds. IPS at 1.

76.     As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's funds.  The charts below use 2020 expense ratios to demonstrate how much more expensive the funds were than their identical counterparts.

**Mutual Funds**

| Current Fund | ER | Identical Lower Share Class Mutual Fund | ER | Excess Cost |
|---|---|---|---|---|
| American Beacon Large Cap Value Inst | 0.62% | American Beacon Large Cap Value Inst R6 | 0.58% | 7% |
| Principal Mid Cap Blend Separate Acct Inst | 0.68% | Principal Mid Cap Blend Separate Acct R6 | 0.60% | 13% |
| T.Rowe Price Blue Chip Growth | 0.72% | T.Rowe Price Blue Chip Growth (I) | 0.58% | 24% |

**Collective Trusts**

| Current Fund | ER | Identical Lower Cost Collective Trust | ER | Excess Cost |
|---|---|---|---|---|
| SSgA Target Retirement 2020 NL SF CL A | 0.37% | SSgA Target Retirement 2020 NL SF CL A | 0.03% | 1,113% |
| SSgA Target Retirement 2025 NL SF CL A | 0.37% | SSgA Target Retirement 2025 NL SF CL A | 0.03% | 1,113% |
| SSgA Target Retirement 2030 NL SF CL A | 0.37% | SSgA Target Retirement 2030 NL SF CL A | 0.03% | 1,113% |
| SSgA Target Retirement 2035 NL SF CL A | 0.37% | SSgA Target Retirement 2035 NL SF CL A | 0.03% | 1,113% |
| SSgA Target Retirement 2040 NL SF CL A | 0.37% | SSgA Target Retirement 2040 NL SF CL A | 0.03% | 1,113% |

| Current Fund | ER | Identical Lower Cost Collective Trust | ER | Excess Cost |
|---|---|---|---|---|
| SSgA Target Retirement 2045 NL SF CL A | 0.37% | SSgA Target Retirement 2045 NL SF CL A | 0.03% | 1,113% |
| SSgA Target Retirement 2050 NL SF CL A | 0.37% | SSgA Target Retirement 2050 NL SF CL A | 0.03% | 1,113% |
| SSgA Target Retirement 2055 NL SF CL A | 0.37% | SSgA Target Retirement 2055 NL SF CL A | 0.03% | 1,113% |
| SSgA Target Retirement 2060 NL SF CL A | 0.37% | SSgA Target Retirement 2060 NL SF CL A | 0.03% | 1,113% |
| SSgA Target Retirement Income NL SF CL A | 0.37% | SSgA Target Retirement Income NL SF CL A | 0.03% | 1,113% |
| SSgA U.S. Bond Index NL SF CL A | 0.32% | SSgA U.S. Bond Index NL SF CL A | 0.12% | 2567% |
| SSgA U.S. Inflation Protected Bond Index NL SF CL A | 0.31% | SSgA U.S. Inflation Protected Bond Index NL SF CL A | 0.12% | 2483% |
| SSgA U.S. Long Treasury Index NL SF CL A | 0.32% | SSgA U.S. Long Treasury Index NL SF CL A | 0.12% | 2567% |

**Stable Value Fund**

| Current Fund | ER | Identical Lower Cost Fund | ER | Excess Cost |
|---|---|---|---|---|
| MetLife Stable Value, Series 25053 CL 0 | 0.90% | MetLife Stable Value, Series 25053 CL 0 | 0.62% | 45% |

77.     The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

78.     The assets under management easily qualified the Plan for the lower share classes. The following is a sampling of the assets under management as of the end of 2018:

| Current Fund | 2018 Assets Under Management |
|---|---|
| SSgA Target Retirement 2020 NL SF CL A | $47,790,789 |

| Current Fund | 2018 Assets Under Management |
|---|---|
| SSgA Target Retirement 2025 NL SF CL A | $84,271,264 |
| SSgA Target Retirement 2030 NL SF CL A | $64,316,601 |
| SSgA Target Retirement 2035 NL SF CL A | $63,144,588 |
| SSgA Target Retirement 2040 NL SF CL A | $39,161,654 |
| SSgA Target Retirement 2045 NL SF CL A | $40,272,881 |
| SSgA Target Retirement 2050 NL SF CL A | $22,634,555 |
| SSgA Target Retirement 2055 NL SF CL A | $14,341,402 |
| SSgA Target Retirement 2060 NL SF CL A | $4,831,829 |
| SSgA Target Retirement Income NL SF CL A | $6,033,335 |
| SSgA U.S. Bond Index NL SF CL A | $32,459,501 |
| SSgA U.S. Inflation Protected Bond Index NL SF CL A | $10,292,027 |
| SSgA U.S. Long Treasury Index NL SF CL A | $36,569,711 |
| American Beacon Large Cap Value Inst | $10,310,318 |
| Principal Mid Cap Blend Separate Acct Inst | $13,963,667 |
| T.Rowe Price Blue Chip Growth | $30,866,526 |
| MetLife Stable Value, Series 25053 CL 0 | $321,637,855 |

79.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.  Instead, here, Defendants made investments with higher costs (higher expense ratios) available to participants

while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received. This reduced the likelihood that participants would achieve their preferred lifestyle in retirement.

80.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment. Defendants have no reasonable excuse for not knowing about the immediate availability of these lower cost share classes. Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for the Plan's participants.

81.     Indeed, because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds could not have (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.

82.     Additionally, fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing [to pay for recordkeeping]," *Tibble III*, 2017 WL 3523737, at * 11, especially in this case where, as described below, the Plan paid well-above market rates for recordkeeping.

83.     A more prudent arrangement in this case, also more transparent and easier to comprehend by participants, would have been to take advantage of the Plan's scale by selecting available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees.

84.     Failure to do so violated at least two tenets. First, it violated long-standing DOL guidance which has explicitly stated that employers are held to a "high standard of care and

diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." See, "A Look at 401(k) Plan Fees," *supra*, at n.3.

85.     Second, it violates the Restatement of Trusts, which puts cost-conscious management above all else while administering a retirement plan. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (en banc) (quoting Restatement (Third) of Trusts, § 90, cmt. B.

86.     Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention. Either reason is inexcusable.

87.     As a result, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

**B.   Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses.**

88.     The recordkeeper for the Plan during the Class Period was Pentegra Retirement Services which may be a division or subsidiary of Pentegra Services, Inc. *See,* Trust Agreement for Pentegra Defined Contribution Plan for Financial Institutions with Reliance Trust Company effective July 1, 2009 ("Trust Agreement") at 3.

89.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide

a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, QDRO[9] processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

90.     The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

91.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

92.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for participants of the Plan. "At worst, revenue sharing is a way to hide fees.

---

[9] Qualified Domestic Relations Order.

Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

93.     In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because they were saddled with outrageously high recordkeeping fees.

94.      In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

95.      Further, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the

plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2019 Defined Contribution Progress Report at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process). [10]

96.     In this matter, during the Class Period, there was no contractual recordkeeper fee per participant.  Rather, recordkeeping and administrative costs were paid using revenue sharing. The Plan reported the following revenue sharing payments during the Class Period on its 2014-2018 Form 5500s:

| Year | Participants | Payments to Pentegra | Cost Per Participant |
|------|--------------|----------------------|----------------------|
| 2014 | 26,469 | $9,521,031 | $340 |
| 2015 | 27,881 | $9,923,100 | $356 |
| 2016 | 27,527 | $10,057,640 | $365 |
| 2017 | 27,881 | $10,163,370 | $373 |
| 2018 | 27,227 | $10,584,935 | $389 |

97.     Defendants have wholly failed to prudently manage and control the Plan's recordkeeping and administrative costs by failing to try to obtain lower recordkeeping costs than what the recordkeeper was charging.

98.     By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

99.     The Plan had tens of thousands of participants making it eligible for some of the lowest fees on the market.  Recently, Fidelity – a recordkeeper for hundreds of plans - stipulated

---

[10] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

in a lawsuit that a Plan with tens of thousands of participants and over a billion in assets could command recordkeeping fees as low as $14-21. *See Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 204 (D. Mass. Mar. 27, 2020).

100.    NEPC, a consulting group, recently conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report (referenced above) which took a survey of various defined contribution plan fees.  The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other.  The average plan had $1.1 billion in assets and 12,437 participants.  The median plan had $512 million in assets and 5,440 participants.  *See* Report at 1.

101.    NEPC's survey found that plans with over 15,000 participants paid on average $40 or less in per participant recordkeeping, trust and custody fees.  Report at 10.

102.    Another data source, the *401k Averages Book* (20th ed. 2020)[11] studies plan fees for much smaller plans, those under $200 million in assets.  Although it studies much smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a slightly bigger plan like the Plan should be paying for recordkeeping.   That is because recordkeeping and administrative fees should ***decrease*** as a plan increases in size.  For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant.  *401k Averages Book* at p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.  *Id*., at p. 108.  Thus, the

---

[11] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."  *401k Averages Book* at p. 2.

Plan, with over $1.8 billion dollars in assets in 2018 and over 27,000 participants in 2018, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

103.    The Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[12]

104.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

105.    A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

## C.    Defendants Breached Their Duty of Loyalty to the Plan and Its Participants

106.    The structure of this Plan is rife with potential conflicts of interest because Pentegra and its affiliates were placed in positions that allowed them to reap profits from the Plan

---

[12] Case law is in accord that large plans can bargain for low recordkeeping fees. *See, e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

at the expense of Plan participants.  Here, one of the Plan's fiduciaries is Pentegra, and an affiliate or division of Pentegra performs the recordkeeping services for the Plan.

107.    This conflict of interest is laid bare in this case where the Plan includes many collective trusts offered by Pentegra.  As demonstrated above, there were many alternative lower-cost collective trusts – materially similar or identical to the Plan's other collective trusts (other than in price) – available but not selected because the higher-cost funds returned more value to Pentegra.

108.    There appears to be no reasonable justification for the millions of dollars collected from Plan participants that ended up in Pentegra's coffers.

109.    The Board and Pentegra, and the fiduciaries to whom it delegated authority, breached their duty of undivided loyalty to Plan participants by failing to adequately supervise Pentegra and its affiliates and ensure that the fees charged by Pentegra and its affiliates were reasonable and in the best interests of the Plan and its participants.  Clearly, Defendants failed this aspect of their fiduciary duties.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against the Board and Pentegra)

110.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

111.    At all relevant times, the Board Defendants and its members and Pentegra ("Prudence/Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

112.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

113.     The Prudence/Loyalty Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants.   Instead, the Prudence/Loyalty Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence/Loyalty Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.

114.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

115.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

116.    The Prudence/Loyalty Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against the Board)

117.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

118.    The Board Defendants (the "Monitoring Defendants") had the authority and obligation to monitor Pentegra and was aware that Pentegra had critical responsibilities as a fiduciary of the Plan.

119.    In light of this authority, the Monitoring Defendants had a duty to monitor Pentegra and ensure that Pentegra was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Pentegra was not fulfilling those duties.

120.    The Monitoring Defendants also had a duty to ensure that Pentegra possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

121.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of Pentegra or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of Pentegra's imprudent actions and omissions;

(b)     failing to monitor the processes by which the Plan's investments were evaluated and Pentegra's failure to investigate the availability of lower-cost share classes; and

(c)     failing to remove Pentegra as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

122.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

123.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor Pentegra.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Date: October 13, 2020          **CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey                .
Donald R. Reavey, Esquire
(Application for Admission *Pro Hac* Pending)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ Mark K. Gyandoh                .
Mark K. Gyandoh, Esquire
(Application for Admission *Pro Hac* Pending)
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class